IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| STATE FARM FIRE AND CASUALTY COMPANY,<br><br>        Plaintiff,<br>v.<br><br>FRANKLIN CENTER FOR GOVERNMENT AND PUBLIC INTEGRITY, *et al.*,<br><br>        Defendants. | Case No. 1:13-cv-957 (AJT/TRJ) |

## MEMORANDUM OPINION

Certain defamation and business tort claims have been filed against defendant Franklin Center for Government and Public Integrity's ("FCGPI"). In this action, the parties seek a declaration of rights with respect to those claims under a business liability policy issued by plaintiff State Farm Fire and Casualty Company ("State Farm"). Before the Court are cross motions for summary judgment [Doc. Nos. 25 and Doc. No. 22], on which the Court held a hearing on March 7, 2014. Upon consideration of the parties' cross motions for summary judgment, the memoranda filed in support thereof and in opposition thereto, and the arguments of counsel at the hearing held on March 7, 2014, and for the following reasons, the Court concludes that State Farm has a duty to defend, as FCGFI claims. FCGFI's motion for summary [Doc. No. 22] is therefore GRANTED as to State Farm's duty to defend and State Farm's motion for summary judgment [Doc. No. 25] DENIED as to that issue.

### Background

FCGPI is the named insured on a State Farm Businessowners Policy (the "Policy") in effect for the period May 12, 2012 to May 12, 2013. On or about April 8, 2013, GreenTech

1

Automotive Inc. ("GreenTech") filed a civil action against FCGPI and Kenric Ward ("Ward"), an FCGPI employee, in the United States District Court for the Northern District of Mississippi, Oxford Division (the "Suit"). In the Suit, GreenTech alleges liability on the part of FCGPI for defamation (count 1) and intentional interference with business and prospective business relations (count 3), and liability on the part of Ward for intentional interference with business and prospective business relations (count 3). All of GreenTech's claims are based on two articles, authored by Ward, and posted by FCGPI on its website, Watchdog.org. The parties agree that the Policy was in full force and effect during the period relevant to GreenTech's claims.[1]

## Analysis

In filing cross motions for summary judgment, the parties agree that there are no material issues of fact. Therefore, the Court must decide whether summary judgment is appropriate by looking at the four corners of the Policy and the complaint in the Suit. *See Fuisz v. Selective Ins. Co. of Am.*, 61 F.3d 238, 241 (4th Cir. 1995).[2] As stipulated by the parties, the coverage issues pertain to: (1) the application of the Policy term "personal and advertising injury" to the claims alleged in the Suit; and (2) the application of Exclusion ¶17(a), (b), (k), (h)(1) and (n) in Section II to the claims alleged in the Suit.

---

[1] On August 7, 2013, State Farm filed this action against FCGPI seeking a declaration of non-coverage under the Policy for GreenTech's claims in the Suit and other relief under 28 U.S.C. §§ 2201 *et seq.* FCGPI filed its counterclaim, seeking a declaration of coverage under the Policy. Although served, Ward has not responded to the complaint and is in default. The parties agree, however, that any relief obtainable against Ward by State Farm is necessarily tied to the relief it obtains against FCGPI. Pending the outcome of this litigation, State Farm is currently defending FCGPI in the Suit, while specifically reserving its right to deny coverage under the Policy.

[2] The parties have stipulated to the application of Virginia law to this coverage dispute. Furthermore, the parties agree that the underlying Suit constitutes a "suit" within the meaning of the Policy and that the alleged injury occurred within the "coverage area" as required.

In Virginia, the insured must establish a prima facie case that the claim is within the coverage as defined in the policy, absent exclusions. *RAVCO Ins. Co. v. Ward,* 715 F. Supp. 2d 699, 706-707 (E.D. Va. 2010). The insurer must defend unless "it clearly appears from the initial pleading the insurer would not be liable under the policy contract for any judgment based upon the allegations." *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.,* 407 F.3d 631, 636 (4th Cir. 2005) (quoting *Reisen v. Aetna Life and Cas. Co.,* 225 Va. 327, 302 S.E. 2d 529, 531 (1983)). The insurer bears the evidentiary burden of showing that an exclusion applies. *RAVCO Ins. Co.,* 715 F. Supp. 2d at 706-707. Further, the duty to defend arises whenever the complaint in the underlying action alleges facts and circumstances some of which, if proved, would fall within the risk covered by the policy. *Fed. Hill Homeowners Ass'n v. Cmty. Ass'n Underwriters of Am., Inc.,* 384 Fed. Appx. 209, 212 (4th Cir. 2010). The insurer's duty to defend "is broader than [the] obligation to pay, and arises whenever the complaint alleges facts and circumstances, some of which would, if proved, fall within the risk covered by the policy." *AES Corp. v. Steadfast Ins. Co.,* 283 Va. 609, 617, 725 S.E.2d 532, 535 (2012) (quoting *Virginia Elec. & Power Co. v. Northbrook Prop. & Cas. Ins. Co.,* 252 Va. 265, 268–69, 475 S.E.2d 264, 265–66 (1996)). The insurer can only avoid the duty to defend if it is clear that the insurer could not be liable under the policy for any judgment based upon the underlying allegations. *Res. Bankshares Corp.,* 407 F.3d at 636.

Like any other contract, an insurance policy is construed according to its terms, so long as those terms are clear and unambiguous. *RAVCO Ins. Co.,* 715 F. Supp. 2d at 706-707. When a term is not defined in the policy, it is given its ordinary and accepted meaning. *Travelers Prop. Cas. Co. of Am. v. Liberty Mut. Ins. Co.,* 444 F.3d 217, 222 (4th Cir. 2006); *Scottsdale Ins. Co. v. Glick,* 397 S.E.2d 105, 108 (1990). The Court must read words and provisions in the policy

3

within the context of the policy as a whole. *Res. Bankshares Corp.*, 407 F.3d at 636. Where an insurer is the author of a policy, as is invariably the case with respect to policies it issues, ambiguous language pertaining to policy terms is construed in favor of an insured. Thus, if there is any ambiguity regarding potential coverage, the insurer must provide a defense. *Smith v. Allstate Ins. Co.*, 241 Va. 477, 403 S.E.2d 696, 697–98 (1991). Conversely, exclusions from coverage are enforceable only when the exclusions "unambiguously bring the particular act or omission within [their] scope." *Floyd v. Northern Neck Ins. Co.*, 245 Va. 153, 427 S.E.2d 193, 196 (1993). Moreover, the burden rests on the insurer to establish the clear applicability of a particular exclusion from coverage. *Johnson v. Insurance Co. of North America*, 232 Va. 340, 350 S.E.2d 616, 618 (1986). Therefore, "[w]hen an initial pleading alleges facts and circumstances, some of which would, if proved, fall within the risk covered by the policy, the insurance company is obliged to defend its insured." *Parker v. Hartford Fire Ins. Co.*, 222 Va. 33, 278 S.E.2d 803, 804 (1981) (internal quotations omitted).

### A. "Personal and Advertising Injury"

The present dispute involves the Policy coverage in Section II, Coverage L – Business Liability. That section of the Policy provides in relevant part that State Farm "will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'personal and advertising injury' to which this insurance applies. [State Farm] will have the right and duty to defend the insured by counsel of [State Farm's] choice against any 'suit' seeking those damage."

The term "personal and advertising injury" is defined in Section II – Definitions, ¶ 18, which provides in pertinent part as follows:

> 18. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:
> . . . .

4

      d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services.

The first issue is whether GreenTech's claims fall within the coverage of ¶ 18(d).

GreenTech's claims against FCGPI in the Suit are defamation (Count 1) and intentional interference with business and prospective business relations (Count 3). GreenTech seeks "[c]ompensatory damages up to the amount of 85 million dollars to compensate [GreenTech] for the harm to its business reputation and the actual lost business and investments suffered due to the intentional, tortious, unlawful, and otherwise illegal actions of the Defendants identified herein." GreenTech also alleges that the claimed damages "represents the losses ... to [GreenTech] occasioned by Defendants' malicious and defamatory conduct[.]" It also seeks "[p]unitive damages in the maximum amount permitted by Mississippi law for the intentional, malicious, and fraudulent actions of Defendants[.]"

GreenTech's claims for defamation and intentional interference with business and prospective business relations are all based on alleged "oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." GreenTech's claims against FCGFI thus squarely fall within the coverage for "personal and advertising injury." The Court therefore finds and concludes that subject to any applicable exclusions, the Policy provides for coverage of both of GreenTech's claims in the underlying Action under clear and unambiguous provisions, as both claims arise from allegedly libelous statements published by FCGPI.

      **B. Exclusions under Section II - Exclusions ¶ 17(a), (b), (h) (k), and (n)**

5

Having found that the Policy provides business liability coverage for the types of injuries alleged in the Action, the Court turns to whether any of the exclusions in Section II - Exclusions ¶ 17 apply to the otherwise covered claims.[3]

### I. Paragraph 17(a)

Section II - Exclusions ¶ 17(a) excludes coverage for personal and advertising injury "[c]aused by or at the direction of the insured *with the knowledge* that the act would violate the rights of another and would inflict 'personal and advertising injury." (emphasis added).

### A. As to Count 1

In Count I of the Suit, GreenTech alleges that allegedly defamatory statements "were made in bad faith," and "were published with the intent to harm [GreenTech]," and that FCGPI's "failure to verify the truth of the allegations in these articles amounts to at least negligence." Suit Compl. ¶¶ 17-19 [Doc. No. 1-4]. State Farm has a duty to defend FCGFI unless "it clearly appears from the initial pleading the insurer would not be liable under the policy contract for any judgment based upon the allegations." *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 636 (4th Cir. 2005).

It does not "clearly appear" from the allegations set forth in Count I that in order to recover, GreenTech must prove that FCGFI acted with the knowledge required for the ¶ 17(a) exclusion to apply. Because ¶ 17(a) requires *knowledge*, GreenTech's allegations in support of its theory of recovery do not necessarily require knowledge, and it is possible that if Green Tech

---

[3] As a preliminary and threshold issue, FCGFI claims that none of the exclusions in ¶ 17 is enforceable since, unlike the other exclusions in Section II, the ¶ 17 exclusions are incomplete sentences whose meaning cannot be clearly understood and that the opening words of ¶ 17 before the sub-paragraphs, "Personal and Advertising Injury," cannot be grafted onto the individual subparagraphs since that would impose a structure unlike that of any other exclusion, which are expressed in complete sentences within the particular sub-paragraph. The Court finds this contention meritless; and concludes that the exclusions of ¶ 17 are clearly intended to be read with and act as follow on language to the opening phrase of ¶ 17.

recovered on this claim, its recovery may or may not be based on FCGFI's knowledge required for this exclusion to apply. State Farm thus has a duty to defend FCGPI against GreenTech's claims in Count I, as this exclusion may not apply. On the other hand, for the same reasons, the Court cannot say as a matter of law whether State Farm will or will not have an obligation of indemnification with respect to this claim.

### B. As to Count 3

In Count 3, GreenTech alleges against FCGFI the tort of intentional interference with business and prospective business relations. In support of that claim, GreenTech alleges that "[e]mployees, agents, and representatives of [] [FCGPI] have engaged in willful and intentional actions which were calculated to cause damage to [GreenTech] in its lawful business...." Suit Compl. ¶ 37 [Doc. No. 1-4]. It further alleges that "[t]hese actions were taken with the unlawful purpose of causing damage or loss to [GreenTech] without right or justifiable cause on the part of the [FCGFI]" and that "[a]ctual damage and loss resulted to [GreenTech], caused by the unlawful actions of [FCGFI] and their employees, agents, and/or representatives." *Id.* ¶¶ 38, 39. GreenTech more specifically alleges that its damage and loss was "the direct and express result of the articles published by [FCGFI]." *Id.* ¶ 39.

The issue is whether these allegations allege injury "[c]aused by or at the direction of [FCGFI] *with the knowledge that the act* would violate the rights of another and would inflict 'personal and advertising injury.'" It is not at all clear how the language of this exclusion applies or is to be applied to the allegations of Count 3. In any event, there is no clear allegation in Count 3 that FCGFI caused the allege injury "with knowledge" that its "act," presumably the articles posted on its website, would violate GreenTech's "rights." Assuming that FCGFI would have had such knowledge had it known of the articles' falsity, there is no allegation in Count 3

7

that FCGFI knew that the articles were false, nor can such an allegation be necessarily inferred from the allegations that were made. For these reasons, the Court concludes that ¶ 17(a) does not "clearly" and "unambiguously" apply to Count 3 and it therefore does not exclude Count 3 from the duty to defend that State Farm otherwise has.[4]

## II. Paragraph 17(b)

¶ 17(b) excludes coverage for personal and advertising injury "[a]rising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity." Here, depending on the findings of the fact-finder in the underlying Suit, and for the reasons stated above with respect to the application of the ¶ 17(a) exclusion as to Count 1 and Count 3, the Court concludes based on the allegations of the complaint that the ¶ 17(b) exclusion does not necessarily apply to Count 1 and Count 3. As a matter of law, State Farm is therefore obligated to defend and potentially indemnify FCGPI under Count 1 and Count 3.

## III. Paragraph 17(h)(1)

¶ 17(h)(1) excludes coverage for personal advertising injury "[c]ommitted by an insured whose business is: advertising, broadcasting, publishing or telecasting." The parties agree that FGCPI's business is not "advertising," "broadcasting," or "telecasting." The parties disagree, however, over whether FCGPI is an insured "whose business is publishing."

---

[4] Even were this exclusion to apply, State Farm would nevertheless have an obligation to defend as part of its duty to defend Count 1, subject to potential apportionments. *See Fuisz v. Selective Ins. Co. of Am.*, 61 F.3d 238, 245 (4th Cir. 1995) (citing to *Parker v. Hartford Fire Ins. Co.*, 222 Va. 33, 35, 278 S.E.2d 803, 804 (1981) (Under Virginia law, "...where both covered and excluded acts are alleged, the duty to defend attaches."). *See also Morrow Corp. v. Harleysville Mut. Ins. Co.*, 110 F. Supp. 2d 441, 445-46 (E.D. Va. 2000) ("...where the insurer has a duty to defend an insured against part of an underlying suit, the insurer may not mount a defense that is limited to the claims that implicate the periods of coverage and thereby require the insured to provide its own defense for the periods of non-coverage. Rather, because of the insurer's absolute duty to protect the insured's interests, the insurer must provide a defense for the entire claim against the insured. This is true even though some of the costs of that defense may ultimately be apportioned to the insured for the periods of non-coverage.") (internal citation omitted).

It is undisputed that FCGFI is a non-profit corporation that posts news articles on its free, public access website and that GreenTech's claims against it are based in large part on two articles that were posted on that website. State Farm contends that FCGFI is an insured "whose business is publishing" because it is "primarily [involved in] the production of original news content…" and "uses most of its resources to generate and publish a product – news stories – at Watchdog.org." State Farm Mem. in Op. at 3, 5 [Doc. No. 31]. FCGFI concedes that its activities includes the "publishing" of news articles through postings on its website, but contends that its business is not "publishing" for several reasons. First, it argues that even if it can be characterized as a "business" for the purposes of this exclusion, its "publishing" of news articles on its website does not consist of activities that are commonly understood to be those falling within the "publishing business."[5] It also contends that, even if its postings on its website could be deemed "publishing," it cannot be said without reasonable debate that its business "is" publishing since its postings are merely incidental to its actual "business" of exposing governmental fraud, waste and abuse through investigative reporting. More centrally, FCGFI argues that even though there may be broad definitions of the "publishing business" that would include what FCGFI does, there are other reasonable, though more limited, definitions of what it means to be in the "publishing business" that would not include FCGFI's business; and for this basic reason, the exclusion, under settled principles of insurance policy construction and interpretation, must be construed narrowly in order to maximize coverage under the Policy. In

---

[5] FCGFI also argues that its business is not publishing because, as a non-profit corporation, it is not a "business." The Court finds this position untenable. *See Aetna Cas. & Sur. Co. v. Barboursville Am. Legion Post 177, Inc.*, 966 F.2d 1441 (4th Cir. 1992) (applying West Virginia law and rejecting "the view … that not-for-profit organizations cannot by their very natures be considered 'in business' for any purpose."). Nevertheless, its non-profit status is relevant for the purposes of determining whether an ambiguity exists with respect to the scope of the exclusion, such that it may or may not apply to FCGFI.

short, FCGFI argues that this exclusion does not provide fair notice that it applies to coverage FCGFI would otherwise have, particularly since its application to FCGFI would eliminate entirely the broad coverage afforded for "personal and advertising injury," which specifically includes defamation claims based in either libel or slander.

The Policy does not define either the term "publishing" or the phrase "an insured whose business is ... publishing." Under the applicable principles of construction, if the terms of a policy are clear and unambiguous but certain terms are not defined, the terms must be given their plain, ordinary and accepted meaning. *Transcon. Ins. Co. v. RBMW, Inc.*, 262 Va. 502, 512, 551 S.E.2d 313, 318 (2001) (quotations and citations omitted). The Court must therefore first decide whether there is a plain meaning of that language that, within the context of the Policy, gives FCGFI sufficient notice that its activities "unambiguously" come within the exclusion. *See Floyd v. Northern Neck Ins. Co.*, 245 Va. 153, 427 S.E.2d 193, 196 (1993) (the exclusion must "unambiguously bring the particular act or omission within its scope"). In that regard, the test is not what the insurer intended the policy to mean, but rather what a reasonable person in the position of the insured would have understood it to mean. *Morrow Corp. v. Harleysville Mut. Ins. Co.*, 110 F. Supp. 2d 441, 451 (E.D. Va. 2000) (citing *St. Paul Fire & Marine Ins. Co. v. S.L. Nusbaum & Co., Inc.*, 227 Va. 407, 316 S.E.2d 734, 735-36 (1984)). If this exclusion is susceptible to more than one reasonable construction, one of which would cause the exclusion to apply and the other not, then the exclusion may not be applied to reduce coverage. *Virginia Farm Bureau Mut. Ins. Co. v. Williams*, 278 Va. 75, 81, 677 S.E.2d 299, 302 2009)("... if disputed policy language is ambiguous and can be understood to have more than one meaning, we construe the language in favor of coverage and against the insurer.").

"Publishing" has been defined as "the business or profession of the commercial production and issuance of literature, information, musical scores or sometimes recordings, or art." Publishing Definition, Merriam-Webster's Dictionary, http://www.merriam-webster.com/dictionary/publishing (last visited March 31, 2014). Black's Law Dictionary defines "publisher" as "[o]ne who by himself or his agent makes a thing publicly known. One whose business is the manufacture and sale of books, pamphlets, magazines, newspapers, or other literary productions. One who publishes, especially one who issues, or causes to be issued, from the press, and offers for sale or circulation matter printed, engraved, or the like." Black's Law Dictionary 1109 (5th ed.1979). As these definitions suggest, the traditional "business of publishing" implies a commercial enterprise engaged in the production and sale of hard copy informational texts. Here, FCGFI clearly does not engage in the traditional commercial publishing business. Nevertheless, there is no doubt, and FCGFI concedes, that it "publishes" information in the sense that it disseminates information to the public, although its activities are broader than what would be regarded as "publishing."

Putting aside content, FCGFI's "publishing" activities would appear to be no different than that of any organization that posts informational content on a website it maintains to promote or accomplish its underlying organizational purposes or objectives. It is true that, given FCGFI's stated purpose, the nature of that content posted on its website may have greater potential for generating defamation claims, and more claims under the Policy, than other organizations; but the content of its postings does not relate to whether its business "is" publishing . The Court also understands that State Farm's concerns prompting this exclusion may apply just as much to an insured such as FCGFI as to a traditional commercial publisher.

11

Nevertheless, the application of this exclusion turns exclusively on the language used, not State Farm's intentions or underlying objectives.

Other provisions of the Policy also raise questions concerning the precise or intended scope of this exclusion. For example, other sub-parts of ¶ 17(h) specifically deal with when an insured's connection to a website will result in the exclusion of coverage. *See* Exclusions ¶ 17(h)(2) (exclusion for insured whose business is "Designing or determining content of websites for others); *and* ¶ 17(h)(3) (exclusion for an insured whose business is "An internet search, access, content or service provider."). Likewise, another completely separate exclusion deals specifically website usage. *See* ¶ 17(k) (excluding coverage for personal and advertising injury "[a]rising out of an electronic chatroom or bulletin board the insured hosts, owns or over which the insured exercises control"). These specific references in separate exclusions to specific website usages that exclude coverage would reasonably cause an insured to think that claims excluded because of a web-based connection are set forth in those exclusions, and also that, to the extent a web-based connection to a claim would exclude coverage, a specific reference to such a web-based connection would be stated explicitly as part of an exclusion.

Another aspect of the Policy that casts doubt on the scope of this exclusion is the Policy's broad, affirmative coverage of defamation claims that arise from "'personal or advertising injury' arising out of [FCGFI's] business" whereby that injury results from "oral or written publication, *in any manner*." Through this coverage, the Policy clearly contemplates that there are insureds whose businesses engage in acts of "publishing" that do not trigger the blanket exclusion in ¶ 17(k). *See* Policy Coverage L - Business Liability ¶ 2(b) for "personal and advertising injury," defined under Section II – Definitions ¶ 18(d), and subject to the exclusions under ¶ 17(a) and (b)) (coverage for "[o]ral or written publication, in any manner, of material

that slanders or libels a person or organization...," subject to exclusions discussed above based on an insured's knowledge of certain facts). That affirmative coverage unavoidably raises questions under the Policy for which there is no clear answer, including when does an insured, whose activities involve the publishing of information, for which there is coverage for defamation claims, become an insured "whose business is publishing," for whom there is no coverage for defamation claims. Must "publishing" be the insured's only activity, or can an organizational purpose other than publishing information in some format remove it from that category of insureds "whose business is publishing?" If so, what relationship must the "publishing" activity bear to the nature and purpose of the business as a whole? [6]

The Court concludes that within the context of the Policy, there is more than one reasonable meaning of the phrase "an insured whose business is publishing," at least one of which would not cover FCGFI's business activities. State Farm's exclusion therefore fails to place an insured on fair notice as to when and under what circumstances the exclusion applies to defamation or other claims that are otherwise covered, but which arise out of an insured's postings on its website. If State Farm intends this exclusion to cover the internet equivalent of "the publishing business," it must make clear what, in fact, constitutes an "insured whose business is publishing" within the context of website usage, as it has done with other exclusions that specifically specify what communication through the internet are included.[7] In short, it

---

[6] While these issues may appear to raise material factual issues, the parties agree that there are no genuine issues of material fact and that the Court is in a position to decide as a matter of law whether this exclusion applies to FCGFI. In any event, the answers to these questions are irrelevant for present purposes as these issues simply highlight that the scope of the exclusion is neither "unambiguous" nor "clearly applicable" to FCGFI.

[7] *See* Exclusion, ¶ 17(k) (excluding coverage for personal and advertising injury "[a]rising out of an electronic chatroom or bulletin board the insured hosts, owns or over which the insured exercises control").

13

cannot be said without reasonable debate that FCGF's business is publishing for the purposes of this exclusion. This exclusion therefore does not "unambiguously" or "clearly" apply to FCGFI and it therefore may not be enforced to reduce coverage otherwise provided.

## IV. Paragraph 17(k)

¶ 17(k) excludes coverage for personal advertising injury "[a]rising out of an electronic chatroom or bulletin board the insured hosts, owns or over which the insured exercises control." It is undisputed that GreenTech's claims arise out of articles posted on FCGFI's website, not comments posted on a chatroom or online bulletin board on FCGPI's website.[8] This exclusion does not therefore apply.

## V. Paragraph 17(n)

¶ 17(n) excludes coverage for personal advertising injury "[a]rising out of a criminal act committed by or at the direction of the insured." Based on the allegations of the complaint, GreenTech's claims are based in tort and thus do not arise out of a "criminal act, committed by or at the direction of the insured." This exclusion therefore does not apply.

## Conclusion

For the above reasons, the Court finds and concludes that State Farm has a duty to defend FCGPI as to both Count 1 and Count 3 of the Suit, with issues of indemnification to be determined following the conclusion of that litigation and with this case stayed pending the outcome of that litigation.

An appropriate Order will issue.

---

[8] *See* Joint Stip., Ex. A at 52:22-25 (FCGPI also does not maintain any chatrooms or bulletin boards.)

14

...

/s/
_____
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
April 4, 2014